AO 102 (01/09)  Application for a Tracking Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

In the Matter of the Tracking of
*(Identify the person to be tracked or describe
the object or property to be used for tracking)*
A BLUE SUBARU OUTBACK, OHIO LICENSE PLATE
HYD2241, VIN 4S4BRCCC9C3214280

)
)
)
)
)
)

Case No.  1:20-MJ-00042

## APPLICATION FOR A TRACKING WARRANT

I, a federal law enforcement officer or attorney for the government, have reason to believe that the person, property, or object described above has been and likely will continue to be involved in one or more violations of ___21___ U.S.C. §841(a)(1) and 846.  Therefore, in furtherance of a criminal investigation, I request authority to install and use a tracking device or use the tracking capabilities of the property or object described above to determine location.  The application is based on the facts set forth on the attached sheet.

☑ The person, property, or object is located in this district.

☐ The person, property, or object is not now located in this district, but will be at the time of execution.

☐ The activity in this district relates to domestic or international terrorism.

☐ Other:

The tracking will likely reveal these bases for the warrant under Fed. R. Crim. P. 41(c): *(check one or more)*

☑ evidence of a crime;

☐ property designed for use, intended for use, or used in committing a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ a person to be arrested or a person who is unlawfully restrained.

☑ I further request, for purposes of installing, maintaining or removing the tracking device, authority to enter the following vehicle or private property, or both:

A BLUE SUBARU OUTBACK, OHIO LICENSE PLATE HYD2241, VIN 4S4BRCCC9C3214280

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Tyran Golden, Special Agent DEA
_____
*Applicant's printed name and title*

Sworn to before me and signed in my presence.

Date:  **Jan 21, 2020**

_____
*Judge's signature*

City and state:  Cincinnati, Ohio

Hon. Stephanie K. Bowman, U.S. Magistrate Judge
_____
*Printed name and title*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **IN THE MATTER OF THE TRACKING OF A BLUE SUBARU OUTBACK, OHIO LICENSE PLATE HYD2241, VIN 4S4BRCCC9C3214280** | **CASE NO. 1:20-MJ-00042** |
| | **UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SERACH WARRANT**

I, Tyran Golden, Special Agent with the Drug Enforcement Administration (DEA), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and Title 18 U.S.C. § 3117 to authorize the installation and monitoring of a tracking device in or on a blue Subaru Outback, bearing Ohio license plate number HYD2241 and vehicle identification number 4S4BRCCC9C3214280, hereinafter referred to as the **SUBJECT VEHICLE** Based on the facts set forth in this affidavit, I believe that the **SUBJECT VEHICLE** is presently being used in furtherance of violations of Title 21 United States Code, Sections 841(a)(1) and 846 and that there is probable cause to believe that the installation of a tracking device in or on the **SUBJECT VEHICLE** and use of the tracking device will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

2.  I am a Special Agent with the U.S. Drug Enforcement Administration, and have been since July 2018. I am currently assigned to the Cincinnati Resident Office of the DEA. I received specialized

training from the DEA, including the 16-week Basic Agent Training course. This training focused on methods of unlawful drug trafficking; the identification of controlled substances; surveillance; undercover operations; confidential source management; the means by which drug traffickers derive, launder, and conceal their profits from drug trafficking; the use of assets to facilitate unlawful drug trafficking activity; and the law permitting the forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate drug violations.

3.    As a DEA Agent, I have participated in all aspects of drug investigations, including physical surveillance, installation and monitoring of GPS devices, execution of search warrants, arrests of drug traffickers, and Title-III wiretap investigations. I have participated in the execution of numerous search warrants seeking evidence of violations of the Federal Controlled Substances Act (Title 21 of the United States Code). These warrants covered the search of locations such as residences of drug traffickers and their co-conspirators/associates, drug manufacturing operations, and stash houses used as storage and distribution points for controlled substances. I have also participated in the execution of search warrants for electronic devices and information, such as search warrants for e-mail accounts, mobile telephones, and GPS tracking devices.

4.    By virtue of my involvement in these investigations, I have become familiar with the various means and mechanisms used by narcotics traffickers to import and distribute controlled substances and to remain at large without being detected by law enforcement. I am familiar with the fact that drug traffickers make tremendous profits through drug trafficking, and require large amounts of currency to operate surreptitiously. In this regard, I have obtained and executed numerous search warrants in which I have seized ledgers, notebooks, papers, and other related record-keeping instruments, all of which have been used to record multiple narcotics and related

money laundering transactions. I have also seized telephone books, diaries, invoices, cellular telephones, and correspondence that contained evidence of narcotic trafficking and money laundering violations.

5. I have been involved in interviewing individuals post-arrest, defendants in conjunction with post-arrest proffers, confidential informants, and other non-defendant individuals with knowledge of illegal drug trafficking. During such interviews and through discussions with other experienced agents, I have become familiar with the day-to-day operations of distributors and transporters of controlled substances. I have gained knowledge regarding the various methods, techniques, codes, and/or jargon used by illegal drug traffickers in the course of their criminal activities. This includes information about the packaging and preparation of narcotics, methods in which illicit drugs are smuggled, transported, and distributed, and security measures commonly employed by narcotics traffickers. These security measures include the use of firearms to protect their narcotics-related activities, and the use of cellular telephones, pagers, and personal digital assistants to facilitate communications while attempting to avoid law enforcement scrutiny.

6. As a result of my participation in these and other activities, I have gained particular knowledge in the use of confidential informants, physical surveillance, consensual recordings, investigative interviews, garbage searches, pole-mounted cameras, and GPS tracking devices. Based on my training and experience, GPS tracking devices aid law enforcement in the investigation and detection of illegal drug trafficking by enabling agents to analyze the suspected trafficker's travel patterns. GPS data can aid law enforcement in identifying co-conspirators as well as stash houses, which are residences where contraband and instrumentalities of drug trafficking, such as firearms and drug paraphernalia, are stored.

7.    In addition to using these and other investigative techniques, I have analyzed information from traditional record sources, such as financial records, utility records, and telephone toll and subscriber records. I have also analyzed nontraditional record sources such as the informal ledgers routinely maintained by narcotics traffickers. These informal ledgers, commonly referred to as pay-owe sheets, list amounts of drugs received from sources and distributed to customers and the amounts of money received from customers and owed to sources. I have also gained experience in the identification and collection of drug and non-drug evidence, and the analysis and interpretation of taped conversations obtained by the methods detailed above.

8.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

9.    There is probable cause to believe that violations of Title 21 United States Code, Sections 841(a)(1) and 846 have been committed, are being committed, and will be committed by Jerry VAUGHN, Shannon HIGGINS, and other as-yet known and unknown individuals. I believe there is probable cause that the **SUBJECT VEHICLE** is being used by VAUGHN in furtherance of the aforementioned crimes and that there is also probable cause to believe that the location of the **SUBJECT VEHICLE** will constitute evidence of those criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

10.  In September 2017, officers/agents met with a cooperating defendant (CD#1[1]). CD#1 stated that in September 2016 he/she met with Robert STROUD at the Ivory Coast bar, which is located next to Luxury Sports Auto Sales. Luxury Sports Auto Sales is located at 5360 W. 3rd Street, Dayton, Ohio. CD#1 admitted to purchasing ounce level quantities of fentanyl from STROUD during this meeting. CD#1 also admitted to obtaining powder heroin from STROUD, which they called "real." CD#1 said that in May 2017, STROUD instructed him/her to pick up a vehicle from Luxury Sports Auto Sales, which STROUD referred to as "The Lot." CD#1 said that he/she did not know what STROUD wanted CD#1 to do with the vehicle. CD#1 did not ultimately pick up the vehicle as STROUD had directed.

11.  In November 2017, officers/agents again met with CD#1. CD#1 stated that in May 2017, CD#1 met with STROUD at Luxury Sports Auto Sales. During that meeting, STROUD told CD#1 that "pink shit" was coming. Following STROUD's arrest in July 2017 for conspiracy to possess with intent to distribute controlled substances, CD#1 was contacted by Robert STROUD Jr. CD#1 said that STROUD Jr. offered CD#1 some of the "pink shit" and told CD#1 that STROUD Jr. still had "7 of them" which CD#1 interpreted as seven kilograms of fentanyl.

12.  On November 19, 2019, the Honorable Susan J. Dlott, United States District Court Judge in the Southern District of Ohio, signed a court order authorizing the interception of wire communications to and from Damon BRIER's telephone number 513-302-4488 for thirty days.

---

[1] CD#1 has been convicted of drug offenses and was cooperating for consideration on CD#1's charges. CD#1 has previously been convicted of drug trafficking, drug conspiracy, possession of a firearm, weapons under disability, carrying a concealed weapon, improper handling/discharging of a firearm, trafficking in heroin, and possession of drugs. CD#1 cooperated following CD#1's arrest in 2017. CD#1 was able to provide information that could be independently corroborated. Agents therefore consider CD#1 to be reliable.

Officers/agents executed the court order that same day, however due to a technical issue officers/agents began intercepting wire communications on November 20, 2019.

13. On December 14, 2019 at approximately 2:20 p.m., Shannon HIGGINS departed the area of 1575 Mandarin Drive, Cincinnati, Ohio (HIGGINS' residence), in a white Ford Taurus, bearing Ohio temporary license plate number J945334 (HIGGINS' vehicle), according to the court-authorized GPS tracking device installed on HIGGINS' vehicle. HIGGINS' vehicle traveled directly to the area of Luxury Sports Auto Sales according to the GPS tracking device, arriving at approximately 3:11 p.m. Officers/agents observed, via a camera installed on public property, HIGGINS' vehicle park at Luxury Sports Auto Sales. Officers/agents observed the unidentified male driver of a Nissan Maxima[2] exit the Nissan and enter the front passenger seat of HIGGINS' vehicle. At approximately 3:17 p.m., officers/agents observed HIGGINS and the unidentified male exit HIGGINS' vehicle and enter the driver's seat of the Nissan and the unidentified male enter the front passenger seat of the Nissan.

14. At approximately 3:38 p.m., officers/agents observed a red Buick Lucerne with Ohio temporary license plates J940444, VIN: 1G4HC5EM6BU140886[3] arrive at Luxury Sports Auto sales being driven by an unknown person. Immediately upon the Buick Lucerne's arrival, both HIGGINS and the unidentified male exited the Nissan and walked to the Buick Lucerne. HIGGINS entered the front passenger seat of the Buick Lucerne, while the unidentified male stood next to the car. At approximately 3:41 p.m., HIGGINS exited the Buick Lucerne, entered the driver's seat of

---

[2] On December 16, 2019, officers/agents observed the Nissan parked at the Ivory Coast Bar and observed that the Nissan's license plates were Ohio Dealer license plate 002D9CN. According to the Ohio Bureau of Motor Vehicles, Dealer license plate 002D9CN are registered to Luxury Sports Auto Sales at 5360 W Third Street, Dayton, Ohio.

[3] On December 16, 2019, officers/agents observed that the license plate for the red Buick was Ohio temporary license plate J940444. According to the Ohio Bureau of Motor Vehicles, temporary Ohio license plates are registered to Jerry VAUGHN at 609 Eppington, Dayton , OH 45426.

HIGGINS' vehicle, and departed the area. Based on my training and experience, I am aware that meetings between drug traffickers to distribute controlled substances are often very brief.

15. At approximately 3:54 p.m., BRIERS, placed an intercepted telephone call to HIGGINS. Following is an excerpt of the telephone call as transcribed by the monitoring agent:

| HIGGINS | Oh you look like must ain't cuttin no hair today |
|---------|--------------------------------------------------|
| BRIERS | Yeah it's slow. Just got down here for real. |
| HIGGINS | Oh ok, what time you closin up? |
| BRIERS | I probably leave up outta here about 730 |
| HIGGINS | What you say? |
| HIGGINS | Ok. You about ready? |
| BRIERS | Can't hear you. |
| HIGGINS | You is all ready? |
| BRIERS | Shit I probably will be tomorrow or sumthin. Still working sumthin now. U/I |
| HIGGINS | That's cool. Yeah that's cool |
| BRIERS | I'll probly just do it early tomorrow. |

16. Based on my training, experience, discussions with other law enforcement officers/agents, CD#1's statements that Luxury Sports Auto Sales is a location used to distribute controlled substances, my knowledge that HIGGINS briefly met with the unidentified driver of the Buick Lucerne at Luxury Sports Auto Sales, my knowledge that meetings between drug traffickers to distribute controlled substances are often very brief, and my knowledge that HIGGINS spoke with BRIERS shortly after HIGGINS departed Luxury Sports Auto Sales in HIGGINS' vehicle, I believe that when HIGGINS asked BRIERS if BRIERS' was "ready," HIGGINS was asking BRIERS if BRIERS was ready to purchase controlled substances that HIGGINS had obtained from the occupant of the Buick Lucerne.

17. On December 27, 2019 at approximately 2:16 p.m. HIGGINS' Vehicle departed the area of HIGGINS' residence, according to the GPS tracking device. At approximately 3:09 p.m., HIGGINS' vehicle arrived at Luxury Auto Sales. At approximately 3:34 p.m., officers/agents observed, via a camera, the Buick Lucerne arrive at the location and park directly next to

HIGGINS' Vehicle. Officers/agents observed, via a camera, HIGGINS exit from the driver's door of HIGGINS' Vehicle and enter the front passenger seat of the Buick Lucerne. Approximately one minute later, officers/agents observed HIGGINS exit from the Buick Lucerne and enter the driver's door of HIGGINS' Vehicle. Based on my training and experience, I am aware that meetings between drug traffickers to distribute controlled substances are often very brief. HIGGINS' Vehicle then departed the parking lot and the Buick Lucerne drove to a different area of the parking lot. At approximately 4:01 p.m., officers/agents observed, via a camera, VAUGHN exit the driver's door of the Buick Lucerne. Based on my training, experience, discussions with other law enforcement officers/agents, CD#1's statements that Luxury Sports Auto Sales is a location used to distribute controlled substances, my belief that HIGGINS obtained controlled substances from the occupant of the Buick Lucerne on December 14, 2019 at Luxury Sports Auto Sales, officers'/agents' observations of HIGGINS briefly meet with VAUGHN inside the Buick Lucerne on December 27, 2019 and Luxury Sports Auto Sales, and my knowledge that meetings between drug traffickers to distribute controlled substances are often very brief, I believe that HIGGINS obtained controlled substances from VAUGHN.

18. On January 6, 2020, the Honorable Stephanie K. Bowman, United States Magistrate Judge in the Southern District of Ohio, signed a search warrant authorizing the tracking of the Buick Lucerne. On January 10, 2020, officers/agents installed a GPS tracking device on the Buick Lucerne.

19. According to the GPS tracking device, the Buick Lucerne has remained parked on Eppington Drive, Dayton, Ohio since January 14, 2020.

20. On January 16, 2020 at approximately 1:15 p.m., officers/agents observed, via a pole camera, a blue Subaru Outback, Ohio license plate HYD2241, VIN 4S4BRCCC9C3214280 (SUBJECT VEHICLE) parked in the parking lot of Luxury Sports Auto Sales. According to the Ohio Bureau

of Motor Vehicles, the **SUBJECT VEHICLE** is registered to VAUGHN at 609 Eppington Drive, Dayton, Ohio. An unidentified individual walked away from the **SUBJECT VEHICLE** and enter the passenger seat of a black GMC pick-up truck. Approximately 13 minutes later, the unidentified individual exited the GMC pick-up truck and entered the **SUBJECT VEHICLE**. Another unidentified individual exited the GMC pick-up truck and entered another black truck. The **SUBJECT VEHICLE,** the GMC pick-up truck, and the black truck each departed the area and were not followed by surveillance. Based on my training and experience, I am aware that meetings between drug traffickers to distribute controlled substances are often very brief.

21.     Based on my training, experience, discussions with other law enforcement officers/agents, CD#1's statements that Luxury Sports Auto Sales is a location used to distribute controlled substances, my belief that HIGGINS obtained controlled substances from an unidentified occupant of the Buick Lucerne on December 14, 2019, my belief that HIGGINS obtained controlled substances from VAUGHN on December 27, 2019 following a meeting in the Buick Lucerne, my knowledge that the Buick Lucerne is registered to VAUGHN at 609 Eppington Drive, Dayton, Ohio, my knowledge that the GPS tracker installed on the Buick Lucerne has indicated that the Buick Lucerne has not moved since January 14, 2020, officers'/agents' observations of an unidentified individual entering the **SUBJECT VEHICLE** after briefly meeting with unidentified individuals at Luxury Sports Auto Sales inside a black GMC pick-up, my knowledge that meetings between drug traffickers to distribute controlled substances are often very brief, and my knowledge that the **SUBJECT VEHICLE** is registered to VAUGHN at 609 Eppington Drive, Dayton, Ohio, I believe that VAUGHN is using the **SUBJECT VEHICLE** to distribute controlled substances.

22.     Based on my training and experience, I know that covert GPS tracking devices can provide

more accurate location information than mobile telephone geo-location information. GPS consists of 24 NAVSTAR satellites orbiting the Earth, and each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least three satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude and longitude with a high level of precision. GPS tracking devices provide real-time location information as opposed to mobile telephone geo-location information, which can only provide the telephone's location at approximately 15 minute intervals.

23. Based upon the facts outlined above, I believe that VAUGHN is using the **SUBJECT VEHICLE** in furtherance of his drug trafficking activities. Based on my observations and the observations of other investigators, I know that the **SUBJECT VEHICLE** is presently within the Southern District of Ohio.

24. In order to track the movement of the **SUBJECT VEHICLE** effectively and to decrease the chance of detection, I seek authorization to place a tracking device in or on the **SUBJECT VEHICLE** while it is in the Southern District of Ohio

25. To ensure the safety of the executing officer(s) and to avoid premature disclosure of the investigation, it is requested that the court authorize installation, maintenance, and removal of the tracking device during both daytime and nighttime hours. Effectuating this warrant under cover of darkness will help officers avoid detection and promote officer safety.

26. In the event the Court grants this application, there will be periodic monitoring of the tracking

device during both daytime and nighttime hours for a period not to exceed 45 days following issuance of the warrant. The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

## AUTHORIZATION REQUEST

27. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117, authorizing members of the Drug Enforcement Administration (DEA) or their duly designated representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to install a tracking device in or on the **SUBJECT VEHICLE** within the Southern District of Ohio within ten days of the issuance of the proposed warrant. The warrant also authorizes DEA agents or their authorized representatives to maintain, repair, and/or replace the tracking device as necessary, and to remove the tracking device from the **SUBJECT VEHICLE** after the use of the tracking device has ended; to install, maintain, and remove the tracking device during both daytime and nighttime hours; and/or move the **SUBJECT VEHICLE** to effect the installation, repair, replacement, and removal of the tracking device; and to monitor the tracking device for a period of 45 days following the issuance of the warrant, including when the tracking device is inside private garages and other locations not open to the public or visual surveillance, but within and outside the Southern District of Ohio.

28. In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I further request that the warrant delay notification of the execution of the warrant for 30 days after the end of the authorized period of tracking (including any extensions thereof) because there is reasonable cause to believe that providing immediate notification may have an adverse

result, as defined in 18 U.S.C. § 2705. Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior.

29. I further request that the Court seal the warrant and the affidavit and application in support thereof, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office and may be served on Special Agents and other investigative and law enforcement officers of the Drug Enforcement Administration, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant. These documents pertain to and discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation. Sealing these documents will also better ensure the safety of agents and others.

Respectfully submitted,

Tyran Golden
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on this ___21st___ day of January, 2020



HONORABLE STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE

